O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 2:13-cv-08352 ODW |
| Plaintiff, | CR 09-00052-ODW-** |
| v. | **ORDER GRANTING RECONSIDERATION AND DENYING PLAINTIFF'S MOTION TO VACATE JUDGMENT AND SENTENCE AND WITHDRAW PLEA, PURSUANT TO 28 USC 2255** |
| GLENN BOSWORTH, | |
| Defendant. | |

### I.     MOTION FOR RECONSIDERATION

On April 8, 2014, this court entered an Order Denying Bosworth's Motion to Vacate the Judgment and Sentence on the basis that the motion was untimely.  Thereafter, Bosworth filed a Motion for Reconsideration asserting that under the holding of *Clay vs. United States*, 537 U.S. 522 (2003) his motion was filed well within one year of the Supreme Court's denial of his writ of certiorari.  The Court finds he is correct and grants the Motion for Reconsideration and withdraws its earlier order denying the Motion to Vacate on untimeliness grounds.  Having considered the Motion on its merits, the motion to vacate the judgment and withdraw the plea of guilty is DENIED.  The motion to vacate the sentence is provisionally GRANTED.  Provided certain conditions are met, Bosworth's sentence will be vacated and he will be resentenced..


## II. PROCEDURAL HISTORY

On February 20, 2009 Plaintiff plead guilty to Count 1 of the Information, charging him with violation of 18 USC §2422(b) Use of a facility of Interstate Commerce To Induce a Minor To Engage in Criminal Sexual Activity. After no fewer than nine continuances, on October 22, 2010 Petitioner was sentenced to nine years in prison with 20 years of supervision to follow. U.S. Probation had recommended the mandatory minimum sentence of 10 years imprisonment. The conviction and sentence were affirmed by the Ninth Circuit on February 22, 2012 [105].

On October 31, 2013 Defendant filed the instant motion to vacate his conviction and sentence and to allow withdrawal of his previously entered guilty plea, pursuant to 28 U.S.C. §2255. For the reasons discussed in the following pages, the motion is DENIED in part.

## III. FACTUAL SUMMARY

From November 28 until the date of his arrest on December 17, 2008, Defendant, who used the screen name SeekingMissRight, engaged in a series of internet communications with an undercover agent, who he believed to be the mother of a 12 year old girl. The purpose of those communications, from the first day, was to induce the young girl's mother to permit the Defendant to have sex with her child. Specifically, beginning on November 28, 2008 defendant, by way of instant messaging, initiated a conversation with an undercover FBI agent, operating from a Los Angeles based computer, in a chat room entitled Special Interests – Open Minded Parent. During this initial conversation, defendant told the FBI agent, whose screen name referenced status as a mother, that he was looking for an "openminded mother" who would allow her daughter to experience sex with an older man, noting that teen boys lacked the requisite sexual experience to properly treat a young girl. Defendant further asked whether the purported daughter, who was identified as nearly

13 years of age, was "developing" and asked her bra size.  He then sent a picture of himself and asked the mother to show the picture to her daughter and to in turn send him a picture of the daughter.

In subsequent internet communications, defendant continued to discuss with the mother how he wanted to meet to have sex with her daughter, claiming that he had two past sexual experiences with minors and reiterated his belief that there were lots of women who want their daughters to learn about sex from experienced adult males rather than teen boys.  In addition, during one of these communications, he sent a picture of a nude male, which he represented as a picture of himself..

As the discussions progressed, defendant arranged a December 9, 2008 meeting with the mother at an Orange county mall so that they each could develop a comfort level with the other before proceeding with the sexual encounter.  During this meeting, in which a female FBI agent assumed the role of the mother, the mother advised defendant that her daughter was actually 12 years old, but would be turning 13 in the immediate future.  During the ensuing conversation, defendant again made reference to a past sexual experience he had with a young child and further informed the mother that he had child pornography back at this house.  In the course of this meeting, the two agreed to meet at a hotel in the immediate future for purposes of him having sex with the child..

On December 9, 2008, defendant initiated another chat with the mother, and then after requesting the daughter's screen name, he chatted with the daughter as well.  During the conversation with the daughter, defendant informed her that her mother wanted her "to have a safe lover who will be good to you" and further asked if she had talked to her mom about the conversations that he had been having with her regarding future sex.  Later,

when chatting again with the mother, defendant noted his opinion that the daughter seemed interested in having sex and asked the mother for a new picture of the daughter, asking if the daughter would send him a topless photo of herself.

The following day, defendant and the mother resumed their internet communication, with defendant discussing at length and in graphic detail the type of sex he intended to have with the daughter and advised the mother that he would show the daughter pictures of child pornography "to show her that other girls enjoy sex."

Over the course of the next several days, defendant and the mother had multiple internet communications in which they agreed that the sexual encounter would take place on December 18, 2008 in a Long Beach hotel. Defendant indicated that he would bring the laptop containing the child pornography, overnight clothing, lotion, and a small vibrator.

Defendant was arrested after he arrived at the hotel. The laptop he was carrying contained several pictures of child pornography. He brought with him overnight clothing, lubricant, condoms, pills that claim to enhance penis size, gifts for the daughter, and a small vibrator.

## IV. RELIEF SOUGHT

Defendant seeks to withdraw his plea of guilty on the basis of the occurrence of a number of claimed errors, the cumulative effect of which, he argues, has resulted in a miscarriage of justice.

1. Defendant Bosworth Seeks an Evidentiary hearing into claims of ineffective assistance of counsel. Specifically, he complains of counsels'

    a. Failure to obtain and review material discovery;

    b. Failure to file suppression motion regarding statements made by Defendant in

4

violation of *Miranda*.

c. Failing to challenge alleged prior related acts of sexual activities with minors.

d. Failure to object to violation of Defendant's Sixth Amendment right to an open and public sentencing hearing.

e. Failure to conduct investigation into Defendant's claims of factual innocence.

2. The Court Abused its Discretion in Excluding Family Members from Sentencing Hearing.

3. Government Allegedly Altered Audio Recordings.

## V. DISCUSSION

First, it is important to note that there is no claim by Bosworth that his guilty plea was involuntary. In fact, he signed a statement within the plea agreement that he understood the terms of the agreement and voluntarily agreed to those terms. (Plea Agrmt p. 15:7-8) He further attested to the fact that "No one has threatened or forced me in any way to enter into this agreement." Second, he makes a number of complaints against his counsel, yet he raised none of those complaints at any hearing before the court. In fact, as part of the plea agreement, he expressly states or subscribed to the statement: "Finally, I am satisfied with the representation of my attorney in this matter." (Id. at p. 15:15-17.)

Third, he complains about an allegedly altered audio recording of his interviews by the authorities. These are interviews and recordings of which the court was completely unaware and therefore played no role in the court's sentencing decision. If in fact the recordings were not authentic they would have been suppressed. However, since those recordings were not part of the information before the court in any event Bosworth cannot complain of any prejudicial impact. It is axiomatic that a sentencing judge cannot be

influenced by facts of which he is unaware.

With regard to Bosworth's complaint of his attorney's failure to investigate "alleged prior related acts of sexual activities" he discounts the fact that it was he who raised the issue of his prior experiences. During a conversation about when a girl began showing an interest in sexual matters he mentioned a four year old climbing into bed with him. (Chat transcript at p. 30.) In any event he appears to be criticizing his lawyer for not attempting to prove that he had never had any such encounters. That is simply not realistic. Precisely how would they attempt to prove he had never done something? In any event, his sentence was not enhanced because of anything extraneous to the instant offense.

His criticism of his attorney's failure to conduct an investigation of his claim of factual innocence is wholly without merit. His lawyers indicated that they had read the transcripts and found nothing mitigating. The court shares that view. Those transcripts demonstrate in shocking detail what his intentions were with respect to this, albeit fictitious, 12 year old girl. He then traveled from San Diego to a hotel in Long Beach with various sex toys, just as he said he would, for the purpose of executing his detailed plan to have sex with this young girl. That was the evidence presented to the court. That is what he admitted to in his plea agreement and orally to the court and that was the basis for the imposition of the sentence.

Bosworth's remaining claim of error was the court's strong recommendation that his daughter not attend the sentencing hearing where she could have been exposed to things about her father that she would have found unsettling to say the least. It may well have altered their relationship irreparably.

**A. Habeas Relief Is Not Warranted on Bosworth's Claim of Ineffective Assistance of   Counsel.**

    **1. Applicable Law**

Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984) a petitioner claiming ineffective assistance of counsel must show that counsel's performance was deficient and that the deficiency prejudiced his defense. "Deficient performance" means unreasonable representation falling below professional norms prevailing at the time of trial." Id. at 688-689. To show deficient performance, a petitioner must overcome a "strong presumption" that his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. The court must determine whether "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id.

In order to meet his burden of showing the distinctive kind of "prejudice" required by *Strickland*, a petitioner must affirmatively "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at p. 694, see also, *Harrington* v. *Richter* 562 U.S. ___ (2011) "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practice or most common custom."

Here, one need not speculate whether absent counsel's alleged deficient performance the result of the proceeding would have been different. It would not. In light of the evidence presented to the Court, which evidence was Bosworth's own on-line writings, the accuracy of which has not been challenged, in addition to his plea of guilty, each element of the offense was conclusively established.

**2. It Was Bosworth Himself, Not His Attorney, Who Made the Tactical Decision Which Prejudiced Him.**

If there was a single event which adversely impacted Bosworth at the time of his sentencing, it was the transcripts.  Bosworth, in his statement to the court stated: "I did try to turn my affections towards the agent who was the mother, and she encouraged me to go back to talking about the daughter. I was told to bring the things that I brought." [Transcript of sentencing hearing, September 13, 2010, Doc 87, p. 18:19-21.]

Mr. Bosworth indicated that he had a copy of the transcript of the AOL chats.  The Court asked whether defendant wished to proceed with sentencing, or continue the sentencing to permit the court to review the AOL chat transcript in order to verify defendant's assertion that he had been the victim of government entrapment.  His lawyer, after conferring with Bosworth, asked to continue the matter.  But for his personal request that the court review the transcripts of his chat with the undercover FBI agent, the court would have been unaware of the contents of those chats and was prepared to proceed with sentencing on the basis of the Information, the PSR and the Plea Agreement.  Of all the things that affected the outcome of the proceedings, the single most important was the transcript.  Bosworth cannot lay that at the feet of his attorney.  What wasn't captured in the transcript of the hearing was the colloquy between he and his attorney who was attempting to dissuade him from insisting that the court procure those transcripts and read them.  The attorney had read the transcript and knew that his assertion of government misconduct would not be borne out, but Bosworth rejected his attorneys advice.  That was his undoing,

### 3. Bosworth's Remaining Claims of Ineffective Assistance Deal with Matters Irrelevant to the Court's Sentencing Determination.

The allegations of altered audio recordings is a non-issue.  The audio recording was not material to the hearing.  Indeed, the court first learned of the existence of the audio

recording long after the sentencing. The only items the court relied upon in determining the 18 USC 3553(a) factors pertinent to the sentence, were the Information, the Plea Agreement, the PSR, letters submitted on behalf of the defendant and the transcript of the AOL chats. Moreover, the "evidence" of tampering raises more questions than it answers. The audio forensic expert does not state that portions of conversations have been cut out of the audio recording. Bosworth states in his declaration attached as Exhibit A to the Motion, that he "believe[s] the missing portions would show that [he] expressed flirtatious interest in the adult FBI agent, to which she rebuffed [his] advances and directed [him] to her daughter." ¶ 9 of Bosworth Decl.]. This is not a new claim by Bosworth and it is only partially true, but false in the most material respect. He did make several advances toward the "mother" all of which were rebuffed. But not once does the transcript reflect that she in any way directed his attention, then, toward the daughter. In point of fact, Bosworth asked the bra size of the fictitious child more times than he hit on the mother.

It should also be pointed out that both before and after December 9, 2008, the alleged date of the recorded conversation between Bosworth and the "mother" the transcript contains absolutely no evidence to support his claim that the agent diverted his attention toward the "child." Yet, he advances the claim that the sole piece of that evidence is contained on a missing segment of the audio, sandwiched between November 28 through December 13, 2008  But even this claim is not definitive. He only states that he "believes" the "missing portions would show" this to be true.

The same holds true with the claim that counsel was deficient in not seeking to suppress this evidence. The fact of the matter is this evidence was never presented to the court, so it was in fact suppressed. The court was never apprised of the existence of the

recordings or of the contents of those recordings, therefore they were not a factor in the court's sentencing decision.

Similarly, the claim that counsel should have interviewed a particular women to disprove Bosworth's own claims to have had a sexual encounter with the woman's daughter carries little or no weight. Such encounters rarely take place in the presence of a parent and her lack of knowledge of such an encounter does not disprove that they in fact occurred. It also fails to address the possibility of such an encounter with another child. But most importantly, he expressly admitted having had two past sexual experiences with minors in the Statement of Stipulated Facts attached as Exhibit A to the Plea Agreement. In the Plea Agreement, neither of these two children are identified.

Of course, Bosworth attempts to minimize the damage caused by his own admissions, claiming it was only "shock talk" to get the attention of others on the internet. He claims that people won't pay any attention to you unless you engage in shocking talk. It is curious that he continued his so-called "shock talk" even after he had the "mother's" attention and she wasn't similarly engaged in such talk, yet she held his attention.

The most specious claim of all is the claim that counsel's performance reached the level of incompetence due to his failure to investigate his claim of factual innocence. Specifically, Bosworth contends that he is innocent of the crime charged because the evidence disclosed that he "tried to turn his affection towards the adult FBI agent, however the agent kept directing his attention back to her daughter." Secondly, "it was the FBI agent who insisted that he bring her 'daughter' the 'gifts' that he brought"; and thirdly "he only wished to meet and talk." He concludes by offering that if these allegations were found to be true, it would have amounted to a "potential entrapment defense."

In point of fact, these issues were all presented in the transcript. Apparently Bosworth is of the view that because the topics were raised, he is entitled to interpret them to his best advantage. The court evaluated the transcripts and reached its own conclusions. Taken in isolation Bosworth's assertions contain a grain of truth. Within the context of the chats as a whole, the Court finds these assertions completely lacking in merit. They will be discussed in turn.

### a. The Government Did Not Attempt to Deflect Bosworth's Attentions From the Mother to the Daughter.

On the Profile page of the purported "mother's" AIM account appears the following statement: "Hi all, I'm a hard working mom residing in Long Beach. I'm doing my best to raise two beautiful daughters (5- Ayssa and 13 - Jessica). **I'm currently in a relationship with another woman**. My ex is long long gone. . long story (lol)" (Emphasis added) One might reasonably conclude that the highlighted language was to dissuade would-be male suitors. During the first ten minutes of Bosworth's on line chat with the mother he asks "are you married . . . have daughters? She indicates that she is divorced, with a girl friend of several years, and provides the ages of her daughters, 5 and 13. He asks if she is a lesbian to which she answers in the affirmative and indicates that she is very happy with her girlfriend. He asks if the daughters prefer men or women to which the mother replied that they are too young to know. He asks:

Bosworth: "Do you and gf ever need a male?"

Mother: "no." ( A few moments later mother asks) "what are your interests?"

Bosworth: "the 13 yr old will soon have sex tho. Honestly? Looking for an open-minded mother."

Mother: "well . . . I may not be good for you because I already have a gf."

11

Bosworth:   "yes, I know . . . and you seem to not want any cock."

Mother ;   "no . . . sorry."

Note, at this point she did not reference the daughter at all.  He brought up the daughter by the following:

Bosworth:   "What will you do for daughter when she wants a guy?"

Mother:   I'd be supportive.

Bosworth: "would you prefer she learn with a teen boy or a man?"

Mother:   "It doesn't matter.  What do you think?"

Bosworth: "Older men would teach her right . Teen will likely essentially rape her.  Men go slow.  They appreciate a lover.  Boys don't have a clue at this point.  She developing?"

Mother:   She is petite.

Bosworth: "I like petite . .  height, weight?"

Mother:   "13 years old  is about 5 feet."

Bosworth: "cute . .  sexy"

A few moments later he asks for a picture as well as her bra size.  Later still he started a conversation which one might consider as "hitting on" the mother, but contrary to his assertion, the mother did not redirect his attention toward the daughter.  Quite the opposite. It began when  he sends a picture of himself and asks the mother if she liked it.  She said it was "nice" and again reminded him that she has a girlfriend.  He then asks "Did you show daughter?" She responds "no . .  do you want me to?"  He says "well . . . its up to you . . . if you think she is ready." "I'm not pressing . .  just asking." Later he asks for the daughter's picture.  Mother asks "what type of picture do you want?" To which he responds, "What type do you have . . . honestly . . . to make me comfortable the more risqué the

12

better." After they exchanged views on the legality of showing pictures of children having sex he asked "do you have nudes of her?" Each and every time he attempted to show interest in the mother, he was rebuffed. But at no time, not once, did the mother redirect the conversation back to the daughter. His assertions to the contrary are simply not true.

In any event, this part of the chat continued in this vein for another 22 minutes when he asks" are you ok with me spending the night in her room on a regular basis if we do hit it off?" Eight minutes later they signed off. On December 12 he writes "Would love to see more revealing picture of her" " Would she pose for a topless picture for me?"

At no point during this exchange did the "mother" attempt to divert his attention to the daughter. It is true that several times he tried to interest the mother in a sexual encounter. with him, but she either ignored the advance or reminded him that she wasn't interested in men. On December 13 he told the mother: "I wake up harder than hell . . . since we met . . . thinking about Jessica." Mother asks what he was thinking about, to which he replied, "just waking up I pull the other pillow over on top of me . . . imagine it's her." The conversation explicitly speaks for itself. The object of his desire was made clear from the outset. That is not to say that he was interested in the child exclusively, but the assertion that the government directed him to the daughter is flatly false.

    b. **Bosworth Attempts to Equate "Gifts" with Sexually Explicit Material and Paraphernalia.**

It is true that the mother asked about gifts for the girls. On December 13 after Bosworth painted a vivid word picture of how he saw the evening of "the event" unfolding, including showing the daughter pictures on the laptop he intended to bring, the mother asked "will you bring Jessica and Alyssa gifts . . something small . . . when we meet?" Earlier, after Bosworth had spoken with the fictitious daughter, the mother commented,

"she seemed really happy that you were planning on taking her to the mall to do some shopping" to which he replied, "girls like to shop" "buy her a cute outfit." Mother: "thanks, that would be nice." However, it was he who suggested taking Jessica shopping on November 28, the day the chats began. "Be nice to take her shopping, to the movies, maybe to Disneyland." Those are gifts. However, he arrived at the hotel with a laptop containing child pornography, overnight clothing, lubricant, a small vibrator, condoms, pills that claim to enhance penis size and gifts for the daughter. (See Statement of Stipulated Facts in Plea Agreement.). None of those items could be considered appropriate "gifts" for a 12 year old girl. Instead, they clearly manifested the purpose of his drive up from San Diego.

### c. The Evidence Clearly Established That The Purpose of Bosworth's Trip From San Diego to Long Beach Was Not Just To Talk.

Bosworth is critical of his attorneys for their failure to conduct a sufficient investigation into his factual innocence. Quite possibly the attorneys read the transcript and concluded that nothing could mitigate, much less undo, the harm caused by Bosworth's own words and actions. Perhaps they realized that nowhere within the transcript was there any indication by Mr. Bosworth that he intended just to have a conversation with the 12 year old.

On the evening of December 12, 2008 Bosworth and the mother discussed the outcome of a chat Bosworth had with Jessica and what they should tell Jessica before the time came.

Mother:   How was the chat?

Bosworth:   Good.  Kinda lifeless, but good.

Mother:     Why do you say lifeless?

14

Bosworth:   Well it was tame.  Christmas tree, animals, general stuff.  Finally I talked about sex.

If Bosworth's motives were somehow in doubt, he certainly cleared that up on December 13, 2008 in a chat with the mother as he was making sure the mother knew exactly what was in store for her daughter and just how intimate their "talk" would be.

Bosworth:  So you really want a man to take her to bed then?

Mother:    Yes.

Bosworth:  Kiss her, feel her, take her top off, then bra, then suck her nipples..  You are ready for that?

Mother:     Yes.

Bosworth:  Slide his hand to her panties?

Mother:    Ok.

Bosworth:  Slip under her panties and slip his fingers in to get her wet and feel her clit while French kissing her?

Mother:    Yes.

Bosworth:   Have her reach for my cock and unbuckle my belt?

Mother:    Ok.

Bosworth: Just trying to paint the picture for you.

Mother:   Thanks.  I was wondering how it was all going to happen.

Bosworth:    Because the reality is that there will be a point of no return.

Thereafter, there are over three more pages of lurid graphic details of how Bosworth envisioned the " talk" going.  And so as to gauge just how penetrating he could permit his vocabulary to become, he inquired of the mother whether she "want[ed] her hymen broken."

Mother:   It would wouldn't it?

Bosworth:  Up to you.

Mother:   Did you tell Jessica of these things last night?

Bosworth:    No.  Was tame.

Mother:    Why did you decide not to?

Mother:   ok

Bosworth:   First chat.  Nervous.

Mother:  She was nervous?

Bosworth:  I was.

Mother: oh.  lol

Bosworth:   I just don't want to go to jail.

Mother:  I don't want to either.

It is difficult to reconcile his concern about going to jail with his intention to only meet the girl to "talk".  It is doubtful that any "mother" reading his chats would conclude that Bosworth had anything in mind other than having illegal sex with a minor.  The real issue here is, where is there any hint that this rendezvous was for innocent purposes?  How could his lawyers have read this and concluded that further investigation was warranted to unearth further evidence that he was innocent?  Investigation into what?

In order to properly  evaluate Bosworth's claim of ineffective assistance of counsel, the court must determine whether "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  However, here, there are no "identified omissions" other than the alleged failure of the defense attorneys to make a reasonable investigation into Bosworth's claims of actual innocence.

Bosworth does not offer any insight into what that investigation might have been expected to disclose which would have been helpful to him.  In other words, he fails to show the prejudicial impact of his attorneys' alleged deficient performance.  Critically, he fails now to advise the court of what that further investigation would have disclosed.   If there was no mitigating evidence to be found, the failure to find it cannot be considered incompetent..

**4.  The Semi-closed Sentencing Hearing Was Not an Abuse of Discretion**

This should fall under the heading, "be careful what you ask for."  Bosworth seeks a resentencing so that his family – by which the court assumes includes his daughter – can attend.  At the time of the sentencing hearing, everyone in the courtroom who had knowledge of what was in the transcripts of the chats understood why Bosworth's daughter, primarily, should not be in the courtroom while matters of her father's conduct, intentions and fantasies regarding minor girls was being discussed.   For example,

Mother: Is it bad that I'm considering this?

Bosworth:   Not at all . . . I think it is very good approach to parenting

Mother:   Thanks.

Bosworth:   A frustrated girl will do nothing but cause you problems.  A sexually satisfied girl will be better in school and at home.

Mother: Yes.  True.

Bosworth:  My daughter should have been fucked since she was about 12.

Mother:   How old is your daughter?

Bosworth:   Didn't get it till 18.  I could tell when she started fucking.  She became more of a person.  She is 28 now.  (Transcript at p.11.)

.  .  .  .

Bosworth:  A whole lot of parents are getting into this.  Moms fuck sons.  Dads daughters.  Moms of daughters let the new dad, step dad fuck her girls.  The kids seem to act better after sex.  I know some families swap kids.   (Transcript at p. 14.)

. . . .

Bosworth:  And what about her bra size?

Mother:  She is small.  I'm not sure if I should say, unless you really need to know..

Bosworth:  Just curious.  My wife was an A –cup.  Got implants.  C-cup.  I was fine with the A-cup.  C-cup was fun.  But really, was fine with A-cup.  Some men like small tits on a woman.  It's like having a 12 year old.

Mother:   Well, she is an A-cup.

Bosworth: I have told all the women I have been with who are small that men like young girls.  And being with a small woman is like being with a 12 year old.  Literally tell them that, and they understand.

Mother:   I see.

Bosworth:  I have had women call me daddy out of the blue.

Mother::   I see.  Did you like that?

Bosworth:  I think women understand a man's desire to fuck his own daughter or very young

Mother:   I see.

Bosworth:   My cock would get harder when they call me daddy.  (Transcript at p. 29.)

It is not the court's place to preserve family relationships, or to protect the illusions of a daughter that her father is a noble and honorable man.  Moreover, there is sufficient Ninth Circuit authority that the exclusion of family members and friends or any part of them during a sentencing hearing, no matter how brief, and even with the apparent agreement of

defense counsel, has Sixth Amendment implications.  The Court will then issue an order to ameliorate those Sixth Amendment concerns.

### V. CONCLUSION

The court finds no merit in the majority of Bosworth's claims of error or alleged deficiencies in the performance of his attorneys and therefore rejects his petition for habeas relief.  The court also finds no justification presented to warrant withdrawal of his guilty plea.  Bosworth has not demonstrated that his plea was involuntarily made.   Nor does it appear that refusal to permit withdrawal of his plea of guilty would be a manifest injustice.   Merely being unhappy with one's sentence is not legal justification for withdrawal of a voluntary, fully informed guilty plea entered after defendant was afforded full due process protections.  See *Pinedo v. United States*, 347 F.2d 142, 148 (1965)

However, to the extent Bosworth desires a fully open sentencing hearing, his request is provisionally **granted**.  It was the Court's misplaced concern that Bosworth's daughter be spared hearing, in his own words, the unspeakable depravity of her father arranging for a sexual encounter with a 12 year old girl.  It was the court's hope that whatever heroic images she still had of her father not be sullied.  But as Bosworth appropriately reminds the court, that is not the role of this institution.  That is his responsibility.  Consequently, a new sentencing hearing will be scheduled at a time convenient to counsel and Bosworth's family members and anyone else he wishes to have in attendance.

At that hearing, the current sentence will be vacated and a new sentencing hearing will be held during which the court will consider anew all relevant conduct and any other information relevant to the 18 USC 3553(a) factors.

The court will also consider anew whether there was sufficient justification not to impose the mandatory minimum sentence. Bosworth will then be resentenced.

Bosworth's counsel will notify the court of several proposed dates for resentencing. If the court does not hear from Bosworth's counsel in 60 days of the date of this Order, the Court will assume that the request has been withdrawn.

**IT IS SO ORDERED.**

**April 28, 2014**

_____

**OTIS D. WRIGHT, II**

**UNITED STATES DISTRICT JUDGE**